UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ADRIENNE GRANT,

      Plaintiff/Counter-Defendant,

vs.                                                                          Case No. 13-12240

ARMAND GRANT,                                                 HON. AVERN COHN

      Defendant/Counter-Plaintiff.

_____/

### MEMORANDUM AND ORDER
### GRANTING IN PART AND DENYING IN PART PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 74)
### AND
### GRANTING DEFENDANT/COUNTER PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 76)[1]

I. Introduction

This is a dispute between plaintiff/counter-defendant Adrienne Grant (Plaintiff)

and her ex father-in-law defendant/counter-plaintiff Armand Grant (Defendant)[2]

centering around the ownership of a home in Michigan.  The dispute is an unfortunate

result of the breakdown of a familial relationship.  It should have settled.

Before the Court are the following motions:

1.      Plaintiff's Motion for Summary Judgment on Defendant's Claims of (1) Slander of
Title, (2) Tortious Interference, and (3) Conversion.  (Doc. 74)

---

[1]Although the Court originally scheduled these motions for hearing, upon review of the parties' papers, the matters are appropriate for decision without oral argument.  See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

[2]Because plaintiff and defendant have the same surname and similar first names, for clarity they will be referred to as "Plaintiff" and "Defendant."

2.  Defendant's Motion for Summary Judgment on Plaintiff's Claims of (1) Breach of Contract, and (2) Unjust Enrichment.  Defendant also seeks summary judgment on his claim for Conversion  (Doc. 76)

For the reasons that follow, Defendant's motion is GRANTED.  Plaintiff's motion is

GRANTED IN PART AND DENIED IN PART.  When all is said and done, Plaintiff has

no right to anything from the sale of the Michigan home.  What remains is a

determination of damages on Defendant's claim for conversion and Plaintiff's claim of

conversion based on jewelry.  As to these claims, the parties would be best served by

simply letting go.  It is time for this litigation to end.

II.  Background

A.  The Grant Family and The Michigan Home

Defendant is a California resident.  His son, Michael Grant, was married to

Plaintiff.  Michael Grant has since passed away.

Michael was mostly unemployed during his marriage to Plaintiff.  Plaintiff was

employed less than a year during the marriage.  During Plaintiff and Michael's marriage,

they incurred significant debt.  The record contains evidence that Defendant and other

family members loaned Plaintiff and Michael Grant money on several occasions and

that they used Defendant's credit card for virtually all of their living expenses.[3]

Sometime in 2005, Plaintiff and Michael Grant decided to move to Michigan so

that their son could play hockey.  On July 20, 2005, to assist Plaintiff and Michael in

---

[3]The credit card statements, which form part of the voluminous exhibits, show that Defendant essentially financed Plaintiff and Michael Grant's lifestyle, and that of their children.  There are entries for multiple types of expenses, including for example gas, groceries, restaurants, clothing, entertainment, sporting equipment, hotel stays, spa visits, medical expenses, gym memberships, and car insurance.

their move to Michigan, Defendant purchased property at 2599 Spyglass, Oakland Twp., MI (the Michigan home). The purchase price for the Michigan home was $630,000, plus $14,012.15 in closing costs. Defendant made the initial down payment of $284,932.15 for the purchase of the Michigan home from his funds. Defendant financed the remainder of the purchase with a loan. Defendant paid the mortgage payments, homeowners association dues, property taxes, and most of the utility bills.

Before the move, Plaintiff and Michael Grant sold their home in California. From the sale, Plaintiff says she and Michael Grant made a $100,000 profit which Plaintiff says Defendant held for the benefit of Plaintiff and Michael Grant. Plaintiff and Michael Grant were left with $47,537.21.

In 2012, Plaintiff sued Michael Grant for divorce.

In April 2013, the state court entered a final judgment of divorce. Plaintiff was granted any interest that Michael may have in the Michigan home.

Eventually, Defendant could no longer afford to continue to make mortgage payments on the Michigan home. Defendant made arrangements to sell the Michigan home. At first, Plaintiff and Defendant were cooperative with regard to the sale of the Michigan home. This later changed.

On March 6, 2013, Defendant received an offer to purchase the Michigan home for $700,000. The offer was conditioned on an interior viewing of the Michigan home. Unfortunately, the relationship between Plaintiff and Defendant soured considerably after the offer was made.

At some point thereafter, Defendant commenced summary eviction proceedings against Plaintiff. The eviction proceedings culminated in a judgment of possession

3

entered in May of 2013.

While the eviction proceedings were pending, Plaintiff began to disassemble the Michigan home and began selling off its amenities and fixtures, including, but not limited to, built-in kitchen appliances, doors, mantel of the fireplace, fireplace screen, light fixtures, bathroom vanity mirrors, built-in movie theater components (speakers, screen, theater projector, and interior sconce lighting), built-in basement bar beverage dispenser and bar appliances, electrical switch covers, and interior trim.  Plaintiff says she had a right to remove these items based on the judgment of divorce in which she was awarded the marital home and its contents.

At some point, the prospective buyer drove by the Michigan home and took a photo of Plaintiff selling its fixtures.  Upon seeing the photos, Defendant obtained a state court order prohibiting Plaintiff from removing the fixtures and damaging the property, and requiring Plaintiff to allow the realtor and the buyer access to inspect the home.  During the inspection, the buyer discovered that there was significant damage to the inside of the home.  After the inspection, the buyer demanded that Defendant replace the appliances removed by Plaintiff and demanded a reduction in the sale price by $65,000 due to the damage.  A revised purchase agreement reflecting a $62,500 reduced sale price was signed on May 7, 2013.

In June of 2013, Plaintiff then sued Defendant in state court.  After the complaint was filed, on June 4, 2013, Plaintiff recorded a notice of lis pendens against the home. This halted the closing.

In August of 2013, Plaintiff offered to removed the lis pendens if the proceeds from the sale were held in escrow.  Defendant agreed subject to being reimbursed for

4

his costs in repairing the home for sale.  Plaintiff declined Defendant's offer.

The prospective buyer did not further pursue the Michigan home.

Eventually, after the case came to federal court on diversity, the Court ordered Plaintiff to discharge the notice of lis pendens.

To date, Defendant says that there is another buyer for the home and the "gross sale price will be $580,000."  It is not clear whether the home has been sold.

### B.  The Scope of the Claims

Plaintiff sued Defendant making several claims, all of which centered on Plaintiff's perceived right to a share of the proceeds from the sale of the home. Defendant counterclaimed, essentially contending Plaintiff has no right to the Michigan home and that Plaintiff acted wrongfully in filing the notice of lis pendens which stopped the sale and by removing fixtures and otherwise damaging the home.  Following cross motions for partial summary judgment, the Court limited Plaintiff's claims to:

> Count IV (Conversion)
>
> Count V (Unjust Enrichment)

and Defendant's Claims to:

> Count II (Slander of Title)
>
> Count III (Tortious Interference)

See Memorandum and Order, Doc. 43.  Particular to plaintiff's claims, the Court said:

> . . . summary judgment is GRANTED to Defendant on the quiet title counterclaim **and the entirety of Plaintiff's complaint arising out of anything to do with the sale of the California home.  Plaintiff's claim to equity in the Michigan home remains; it is limited, however, to the net proceeds of the sale under an unjust enrichment theory (Count V).**

5

(Doc. 43 at p. 2.) (emphasis added).

Plaintiff moved for partial reconsideration.  (Doc. 45).  The Court denied the

motion and directed Plaintiff to file a second amended complaint.  The Court explained:

> It is not clear from a read of the first amended complaint (Doc 11) the extent that the alternative theories apply to her claim to the equity in the Michigan home. The problem is that Plaintiff's complaint is replete with claims to the *title* to the Michigan home, as well as issues related to the California home, which have been dismissed.  As such, reconsideration is DENIED.  However, **Plaintiff is given leave to file a second amended complaint within 30 days limited to her right to the proceeds of the sale of the Michigan home over security interests and outstanding taxes under alternative theories including unjust enrichment**.

(Doc. 46) (emphasis added).

Thereafter, on July 8, 2014, Plaintiff filed a Second Amended Complaint (Doc.

47), asserting the following claims:

Count I - Breach of Contract

Count II - Constructive Trust

Count III - Breach of Fiduciary Duties

Count IV - Conversion

Count V - Unjust Enrichment

Count VI - Fraud

Defendant then filed an amended answer and counterclaim, adding a claim for

conversion arising out of Plaintiff's removal of fixtures from the home.  (Doc. 50).

Defendant moved for partial dismissal of the Second Amended Complaint

(Doc. 49), seeking to dismiss Counts II, III, and VI, essentially arguing that these

claims, which were also raised in the Amended Complaint, were dismissed by the

Court's order limiting plaintiff's claims.  The Court agreed and granted the motion in

an order dated December 12, 2014 (Doc. 62).  This left the following claims by

Plaintiff:

> Count I - Breach of Contract
>
> Count IV - Conversion (relating to jewelry that Plaintiff says is
>
> hers and defendant wrongfully possesses)
>
> Count V - Unjust Enrichment

In the December 12, 2014 order, the Court said the following:

> As to both parties' claims regarding the sale of the Michigan home, the case
> will proceed as follows:
> 1. The Michigan home shall be sold.
> 2. Third party claims, if any, shall be paid.
> 3. The remaining proceeds will be the subject of an accounting which
> will determine (1) defendant's right to reimbursement as stated in the
> Reimbursement Motion, and (2) plaintiff's equitable right to a share of
> the remaining proceeds.

(Doc. 62 at p. 3-4).

In a later order, the Court said:

> ...Defendant may file a motion for summary judgment on Plaintiff's breach of
> contract and unjust enrichment claims at any time. However, the better course
> is to sell the home before filing any motion in light of the fact that Plaintiff is
> limited to only an equitable right to the share of its proceeds.  As to Plaintiff's
> conversion claim, Plaintiff shall file an itemized statement of the jewelry and its
> estimated value within ten (10) days of this order.

(Doc. 66 at p. 3).

Unfortunately, neither party took heed of the Court's orders.  Defendant did not

wait until the home was sold and the proceeds subject to an accounting.  Instead,

Defendant moved for summary judgment on Plaintiff's breach of contract and unjust

enrichment claims.  Defendant also seeks summary judgment on his conversion

claim.

Plaintiff has moved for summary judgment on Defendant's claims for slander of title and tortious interference claims as well as his conversion claim.  Defendant responds that not only should Plaintiff's motion be denied but that he, Defendant, is entitled to summary judgment (although Defendant did not separately move for summary judgment) on his claims.

The Court is constrained to say that the way in which the parties have litigated this case from the over pleading and over briefing leaves little to be desired. At the end of the day, resolving these motions leaves the parties in almost the same place; neither wins.

### III.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

8

Fed. R. Civ. P. 56(c)(1).  The Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, id. at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," Hager v. Pike County Bd. Of Education, 286 F.3d 366, 370 (6th Cir. 2002).

## IV.  Defendant's Motion

Defendant has moved for summary judgment on Plaintiff's breach of contract and unjust enrichment claims.  Defendant says that summary judgment is proper because both claims arise out of the sale of the California home which the Court has previously ruled Plaintiff cannot pursue.  Defendant also says they fail on the merits.

9

Defendant also seeks summary judgment on his claim for conversion which is based on Plaintiff's removal of fixtures from the Michigan home.

Defendant has not moved for summary judgment on Plaintiff's conversion claim regarding jewelry that Plaintiff gave to Defendant for safekeeping which apparently has not been returned.

A.  Plaintiff's Breach of Contract and Unjust Enrichment Claims as Based on California Home

Both Plaintiff's breach of contract claim and unjust enrichment claim are grounded on the assertion that she "expend[ed] substantial sums to improve the home…" At deposition, Plaintiff testified that all of these alleged improvements which form the basis of her claims were paid for with funds from the sale of the California home.  (Defendant's Ex. 1, Plaintiff's Deposition at pp. 120-21).  Plaintiff testified as follows:

> QUESTION: Where did the money come from for making these improvements identified in Exhibit 2, paragraph 44?
>
> PLAINTIFF: From monies that Mr. Armand Grant was holding for us from the sale of the home.
>
> QUESTION: So you're claiming that Armand Grant paid for those improvements with funds that belonged to you?
>
> PLAINTIFF: Yes.

(Ex. 1, p. 105).

. . .

10

QUESTION: So your testimony is that Armand made no investment into the Michigan property, correct?

PLAINTIFF: Correct.

QUESTION: On what basis do you state that?

PLAINTIFF: Because we made the improvements with the money from the sale of the California home.

(Ex. 1, p. 120).

As noted above, the Court previously held that Plaintiff is barred from pursuing any claim "arising out of anything to do with the sale of the California home." This included any claims based upon the proceeds from the sale of the California home.

As a result of Plaintiff's testimony, it is clear that her claim of detrimental reliance in her breach of contract claim and her claim for unjust enrichment are premised upon the funds from the sale of the California home being used to pay for the subject improvements. The Court has already ruled that Plaintiff is barred from pursuing any claim "arising out of anything to do with the sale of the California home" (Doc. 43), therefore, Plaintiff's breach of contract and unjust enrichment claims must be dismissed.

## B.  Additional Reasons Plaintiff's Claims Fail

Putting aside Plaintiff's deposition testimony, in the Second Amended Complaint Plaintiff asserts a breach of contract claim based upon the allegation that she detrimentally relied on an alleged promise by Defendant to hold the equity in the

11

Michigan home for her and Michael Grant's benefit and has suffered damages.

While styled a breach of contract claim, it is more accurately called a promissory estoppel claim and the parties have analyzed it as such. The elements of a promissory estoppel claim consist of (1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee and (3) that, in fact, produced reliance or forbearance of that nature (4) in circumstances requiring enforcement of the promise if injustice is to be avoided. Zaremba Equip, Inc v. Harco Nat'l Ins Co, 280 Mich App 16, 41 (2008). "A promise is a manifestation of intention to act or refrain from acting in a specific way, so made as to justify a promise in understanding that a commitment has been made." State Bank of Standish v. Curry, 442 Mich 76, 84-85 (1993). Promissory estoppel requires an actual, clear, and definite promise, and the reliance on it must be reasonable. Ypsilanti Twp v. Gen Motors Corp., 201 Mich App 128, 134 (1993). Further, "reliance is reasonable only if it is induced by an actual promise." State Bank, 442 Mich at 84.

Plaintiff has not satisfied these elements sufficient to survive summary judgment. First, Plaintiff cannot state with any clarity or definiteness what Defendant's promise was to her. In the Second Amended Complaint, Plaintiff states that the promise was to "hold the equity in the Michigan home for [her and Michael's] benefit." (Doc. 47 at ¶¶12 and 21). In the First Amended Complaint, Plaintiff stated that Defendant promised to hold both the title to the Michigan home and its equity for her and Michael. (Doc. 11 at ¶¶13, 18, 20 and other paragraphs)(Doc. 11) In

12

Plaintiff's deposition, she testified that "it was understood that the home was being purchased by us through Armand for us to

keep." (Defendant's Ex. 1, p. 97).  In her affidavit, which was attached in support of her summary judgment motion, Plaintiff states that "Defendant, Michael and I agreed that Defendant would hold in his name title to the Michigan Home for our benefit using some of the $1,100,000 of the net sales proceeds from the sale of the California House."  (Defendant's Exhibit 28, Plaintiff's Affidavit, ¶7, Ex. 28).  Adding to the confusion, Plaintiff's Second Amended Complaint references two correspondences from Defendant that she says "confirmed" the existence and terms of the alleged promise.  (Doc. 47 at ¶21)(Doc. 47). In Plaintiff's Summary Judgment Motion, she identified these two correspondences/emails.  The emails, referenced as Exhibits F and G, are dated January 9, 2013 and January 12, 2013.  In the January 9, 2013 email, which appears to be a settlement offer to persuade Plaintiff to voluntarily leave the house so that it could be sold, Defendant wrote to Plaintiff's attorney:

> Mr. Lippitt, since you are the attorney for Mrs. Grant, I am advising you that I will demand that your client vacate the premises listed in the subject portion of this email by no later than March 1, 2013. I am offering to guarantee one year rental on an apartment in as much as I want to be certain my grand children (sic.) are properly housed.
>
> I will reimburse myself for all money advanced by me from the proceeds of the sale of the house and I intend to send the remaining funds equally divided between Michael and Adrienne.
>
> I trust that Adrienne will do what ever (sic.) is necessary to comply with my demands as it will benefit her financially.
>
> Regards,
>
> Armand Grant

(the "January 9th Email")

In the January 12, 2013 email, which also intended to be a settlement offer to

persuade Plaintiff to leave the Michigan home so that it could be sold,

Defendant wrote to Plaintiff:

> Adrienne, you are making a serious error in judgment by not allowing your
> house to be show so it can be sold. As I stated in my e-mail to your attorney
> on Wednesday, I will guarantee a lease for 1 year on an apartment. After the
> sale, I will reimburse my self (sic.) of the money I advanced and split the
> remainder equally between you and Michael.
> I trust that you will do the right thing. There is a sizeable equity in the property.
> Mr. Brooks has advised me that he has had multiple requests for showing and
> you have not cooperated in any manner.
>
> Regards,
> Armand Grant

(the "January 12th Email")

These two emails, do not establish that Defendant promised Plaintiff the equity

in the Michigan home.  Instead, they show that Defendant wanted Plaintiff to leave

the house so that he could sell it and that he expected to be reimbursed for all of the

money he advance toward the purchase of the Michigan home and all of his other out

of pocket expenses.  At best, Defendant was willing to split the net proceeds from the

sale of the home after he reimbursed himself for all of his out of pocket expenses.

Further, these emails indicate that the proposal was contingent upon her leaving the

home by March 1, 2013.  Plaintiff failed to move out by the required date.  Indeed,

Defendant commenced eviction proceedings which culminated in a judgment of

14

possession on April 25, 2013.

Due to the changing nature of the promise, there is no evidence that Plaintiff relied upon any promise. As previously discussed, it is unclear what the terms were of the "promise." The inconsistency of the terms of the promise precludes a finding that she relied upon the promise of the equity in the home, especially since Plaintiff represented contented that she thought she was promised title to the home.

Further, in order to establish the last element of a promissory estoppel, Plaintiff must establish that she detrimentally relied upon the promise. Powers v. Peoples Community Hosp Authority, 183 Mich App 550, 554 (1990). In ¶24 of Plaintiff's Second Amended Complaint, Plaintiff states that Defendant's promise "induce[d] [her] to live with Michael in the home and expend substantial sums to improve the home, e.g., installing new cabinetry, removing old and installing new flooring, finishing the basement, installing landscaping, and installing new water heaters and softeners." (Doc. 47). The investment in these improvements cannot serve to establish detrimental reliance. Plaintiff benefitted from each and every improvement, and she sold many of the improvements, retaining the proceeds from the sale. Moreover, there is no evidence that Plaintiff actually paid for the improvements. Nor does Plaintiff say that she would not have made these improvements but for Defendant's promise. Indeed, the promise, contained in the emails, occurred long after the improvements were made.

Finally, Plaintiff cannot satisfy the last element of promissory estoppel, i.e., enforcement of the promise is necessary if injustice is to be avoided. See Zaramba,

15

280 Mich App at 21.  As Defendant notes:

> 1. Defendant funded all of the improvements to the Michigan home. All of the improvements to the Michigan Home were paid for with Defendant's credit card. (Defendant's Ex. 7, Credit Card Receipts)

> 2. Plaintiff received the full benefit of the improvements to the Michigan home for approximately eight years. She lived with and enjoyed the improvements made to the home.

> 3. Plaintiff lived in the Michigan home rent free as Defendant not only paid the $284,932.15 down payment for the purchase of the house, but he also paid all of the mortgage payments, the property taxes, the homeowner association dues, and most of the utilities.

> 4. Plaintiff received more in cash from Defendant while she lived in the Michigan home than the money she allegedly paid for the improvements. Defendant sent Plaintiff and her husband over $212,000 in checks.  See Defendant's Ex. 6 and Ex. 8.

> 5. Plaintiff removed many of the improvements from the Michigan home, including fixtures, when she left, then she sold the improvements and kept all of the sales proceeds.  As Plaintiff explained at deposition:

>> QUESTION: Aside from the movie projector and chairs in the theater room, what else did you remove from the Michigan

>> home?

>> PLAINTIFF: I was awarded all of the contents inside the home. So that meant I was able to take the appliances, whatever furniture, fireplace, any type of item I wanted, including my fixtures.

>> QUESTION: What do you mean by take the fireplace?

>> PLAINTIFF: We had a custom mantel made for the fireplace in the great room.

16

QUESTION: You took that?

PLAINTIFF: I was awarded it.

QUESTION: Who were you awarded it by?

PLAINTIFF: By the judge in my divorce case.

QUESTION: When did you take the mantel?

PLAINTIFF: Everything was removed during my garage sale. And I'm sorry. I forget. And after when I was moving out, I had a very short span of time.

QUESTION: When were you moving out?

PLAINTIFF: I had, I believe, less than two weeks to have to find a place and somehow secure money in order to get out of the home, because Michael Grant still hadn't paid a penny of child support and we had no money?

QUESTION: Approximately what date did you move out of the home, the Michigan home?

PLAINTIFF: It was after May?

QUESTION: No, no. It was in May. I was evicted in May. So I had to leave in May.

(Defendant's Ex. 1, pp. 114-115)

There is no injustice to Plaintiff if the Court refrained from enforcing the promise. Plaintiff simply cannot prevail on her breach of contract claim. No reasonable juror could conclude otherwise.

17

Regarding unjust enrichment, "[w]hether a claim for unjust enrichment can be maintained is a question of law…" <u>Karaus v Bank of New York Mellon</u>, 300 Mich App 9, 22 (2006).  Unjust enrichment is an equitable doctrine.  <u>Morris Pumps v Centerline Piping, Inc</u>, 273 Mich App 187, 193 (2006).  To prevent unjust enrichment, the law will imply a contract only where the defendant has been

inequitably enriched at the expense of the plaintiff.  <u>Id</u>. at 195. "A claim for unjust enrichment requires the complaining party to establish (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." <u>Karaus</u>, 300 Mich App at 22-23.

Plaintiff has failed to establish the necessary elements of an unjust enrichment claim.  Notably, she cannot establish that she conferred any benefit on Defendant. Plaintiff contends that she has unjustly enriched Defendant with the improvements she made to the home and as a result she is entitled to reimbursement for her expenses.  In ¶50 of the Second Amended Complaint, Plaintiff states as the basis of her unjust enrichment claim as follows:

> Moreover, and as a consequence of Defendant representing and agreeing that he was holding the equity to the Michigan Home for the benefit of Plaintiff and Michael, Plaintiff relied thereon to her detriment, e.g. Plaintiff expended substantial sums to improve the home. This included, among other things, installing new cabinetry, removing old and installing new flooring, finishing the basement, installing landscaping and installing new water heaters and softeners.

(Doc. 47).

Contrary to Plaintiff's assertions, Plaintiff has no evidence that she paid for any of the improvements referenced in ¶50 of her Second Amended Complaint. Even assuming Plaintiff did pay for even some of them, she cannot demonstrate that Defendant benefitted from the improvements.  Plaintiff removed and sold most, if not all, of the improvements before she left.  Defendant did not get the benefit of any of the improvements made.  In fact, Defendant had to spend additional funds to repair the home and replace many of the improvements.  In short, there is no basis for an unjust enrichment claim.

### C.  Defendant's Conversion Claim

Defendant's claim is based on Plaintiff removing and selling appliances and fixtures that Defendant paid for and therefore owned.  Common-law conversion is defined as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."  Lawsuit Fin, LLC v Curry, 261 Mich App 579, 591 (2004). The Michigan statute on conversion is clear. A person damaged as a result of "[a]nother person's stealing or embezzling property or converting property to the other person's own use" is entitled to actual damages for the converted property plus "3 times the amount of actual damages sustained, plus costs and reasonable attorney fees."  M.C.L. § 600.2919a.  "The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise." Id.

Plaintiff has admitted to the removal of the appliances and fixtures in her deposition testimony.  Although Plaintiff believed they belonged to her as she was

awarded the contents of the home in her divorce judgment, this ignores that

Defendant, not Plaintiff, owned the Michigan home.  Defendant properly asserted his

rights and obtained a state court order directing Plaintiff not to remove any more

fixtures.  On May 20, 2013, the 52-3 District Court entered an order confirming

Defendant's ownership of the appliances, and specifically enjoining Plaintiff from

"causing further damage to the Subject Property" and "from removing any fixtures

from the Subject Property." (Defendant's Ex. 14).  Despite this order, Plaintiff

continued selling the appliances and fixtures at the home. Plaintiff had no right to

remove the contents and particularly the fixtures.  Defendant is entitled to summary

judgment on his conversion claim.  Although Defendant has put forth evidence of

damages, which comprises the cost to replace the appliances ($34,109), the Court

defers ruling on damages.

V.  Plaintiff's Motion for Summary Judgment

Plaintiff seeks summary judgment on Defendant's claims for slander of title

(Count I), tortious interference (Count II), and conversion (Count III).

Defendant's slander of title and tortious interference claims are based on the

assertion that Plaintiff had no right to file the notice of lis pendens and by doing so,

slandered the title to the home and tortiously interfered with the pending sale of the

home.

A notice of lis pendens is the "'notice, recorded in the chain of title to real

property, . . . to warn all persons that certain property is the subject matter of

litigation. . . .'" Ruby & Assocs., P.C. v. Shore Fin. Servs., 276 Mich. App. 110, 113

20

(2007), <u>vacated in part on other grounds</u>, 480 Mich. 1107 (2008) (quoting Black's

Law Dictionary (8th ed.), p. 950).  The purpose of a <u>notice of lis pendens </u>is "'. . . to

warn persons who deal with property while it is in litigation that they are charged with

notice of the rights of their vendor's antagonist. . . .'" <u>Id</u>. (quoting <u>Backowski v.

Solecki</u>, 112 Mich. App. 401, 412 (1982)).  Thus, purchasers are aware that they take

the property "subject to the outcome of the litigation."  <u>Id</u>. (citing MCL 565.25;

<u>Provident Mut. Life Ins. Co. v. Vinton Co.</u>, 282 Mich. 84, 85–87 (1937); <u>Hedler v.

Manning</u>, 252 Mich. 195, 196–97 (1930)).

To prevail on a claim for slander of title, Defendant must show that Plaintiff

maliciously published false statements that disparaged the title to the Michigan home

and that it caused Defendant to suffer special damages.  <u>B&B Inv. Group v. Gitler</u>,

229 Mich. App. 1, 8 (1998).

While the Court has now concluded that Plaintiff has no equitable right to the

home inasmuch as it has granted summary judgment on Plaintiff's breach of contract

and unjust enrichment claims, it does not follow that the filing of the notice of lis

pendens was itself improper.  Plaintiff, albeit in error, believed that she had a some

right to the home.  Although Plaintiff ultimately does not, the notice of lis pendens

was simply a notice of pending litigation.  It was not substantively determinative.  The

notice was not a false statement because the home was the subject of litigation at

the time the notice was filed.  Moreover, while Defendant believes Plaintiff acted with

malice, the record does not support a finding.  Plaintiff acted on the advice of counsel

in filing the notice and on a mistaken belief that she had a right to the Michigan

21

home.  Her actions may be characterized as fanciful or obstructionist but in the Court's view do not rise to the level of malicious.  No reasonable juror could conclude otherwise.  As such, Plaintiff is entitled to summary judgment on Defendant's slander of title claim.

Regarding tortious interference, which Defendant says he alternatively plead as tortious interference with a business relationship and a business expectancy, the same result obtains.  "The elements of tortious interference with a contractual relationship are (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant."  Jim-Bob, Inc v Mehling, 178 Mich App 71, 96-97 (1989).  The court of appeals also explained that "[one] who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights of business relationship of another."  Id. at 96, quoting Formall, Inc v Community Nat'l Bank of Pontiac, 166 Mich App 772, 779 (1988).

Again, to the extent Defendant says the filing of the notice of lis pendens was a tortious act, he cannot prevail.  The filing itself was not improper even though it has now been determined that Plaintiff has no rights, legal or equitable, in the home.  As to Plaintiff removing the fixtures, which she claimed she had a right to under the judgment of divorce, it cannot be said as a matter of law that these actions resulted in the prospective buyer backing out of the sale.  Notably, the buyer asked for a lower price, thereby indicating a deal could still be made, albeit on less favorable terms to

22

Defendant.  Moreover, Plaintiff's actions are accounted for in granting Defendant summary judgment on his claim for conversion.

## VI.  Conclusion

For the reasons stated above, plaintiff's motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART.  Defendant's claims for slander of title and tortious interference are DISMISSED.

Defendant's motion for partial summary judgment is GRANTED.  Plaintiff's claims for breach of contract and unjust enrichment are DISMISSED.  Plaintiff is liable on Defendant's claim for conversion.

The case continues on the following claims/issues:

1.      Damages on Defendant's claim for conversion

2.      Plaintiff's claim for conversion, both liability and damages

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: July 15, 2016
        Detroit, Michigan